IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| SUZANNE BOREN, Guardian of the | ) | |
| Person and Conservator of the Estate of | ) | |
| ROCKIE HAROLD WATTS, | ) | |
| | ) | |
|     Plaintiff, | ) | Civil Action No.: 5:13cv013 |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHWESTERN REGIONAL JAIL | ) | By: Hon. Michael F. Urbanski |
| AUTHORITY, <u>et al.</u>, | ) | United States District Judge |
| | ) | |
|     Defendants. | ) | |

<u>**MEMORANDUM OPINION**</u>

Before the court are six motions to dismiss filed by defendants Northwestern Regional Jail Authority ("NRJA") and Northwestern Regional Adult Detention Center ("NRADC") (Dkt. No. 7)[1]; Superintendent Bruce R. Conover of NRADC ("Superintendent Conover") (Dkt. No. 16); Linda Weeks, LPN (Dkt. No. 25), Tracy Holsinger, LPN (Dkt. No. 18), and Allena Kovak, LPN (Dkt. No. 9), ("the Nurse defendants"); and Tammy Bickert, Jason Clark, Louis Dusing, and James Coffelt ("the Officer defendants") (Dkt. No. 5).

**I.    <u>Facts</u>**

The facts as alleged in the complaint are as follows:  Rocky Harold Watts ("Watts"), age forty, was arrested and taken into custody at 1:15 p.m. by officers of the Winchester City police on May 5, 2011.  Watts was charged with profane swearing and public intoxication in violation of Virginia Code § 13.2-388.  After Watts' arrest, the officers transferred Watts into the custody of the NRJA as a pretrial detainee subject to a Commitment Order, which allowed Watts to be released upon his own recognizance when he was no longer intoxicated.

---

[1] By agreement of the parties, NRADC was dismissed as a party defendant after oral argument.  (Dkt. No. 56.)

When Watts entered NRJA custody, he was administered an Alco-Sensor test, which registered his blood alcohol content at 0.19, and placed in a holding cell.  At 7:27 p.m., another Alco-Sensor test was administered, at which time Watts registered a 0.10, despite having consumed no alcohol since being admitted to the jail several hours earlier.  At 9:29 p.m., Officer Clark conducted a routine security check of the cell block and found Watts in his cell with his legs hanging off of the bunk and a blood pattern around his nose and mouth.  The complaint alleges that the blood pattern was indicative of Watts having bitten his mouth, possibly during a seizure.  Officer Clark asked Watts if he knew where he was and contacted Nurse Weeks.  Nurse Weeks responded that she would "check his vitals later."  Compl. at ¶ 28.  At this time, no other medical attention or evaluative services were rendered by Officer Clark or Nurse Weeks.

At 9:50 p.m., Officer Clark conducted another security round, where he witnessed Watts standing in his cell looking out of the window.  At this time, Watts warned Officer Clark that he was going to have a seizure and fell backwards hitting his bunk on the way to the floor.  Officer Clark yelled for Officer Dusing to contact the medical unit.  All three Nurse defendants responded to Watts' cell.  The complaint indicates the Nurse defendants may have checked Watts' vitals but did not render any other medical care or service.  All of the Officer defendants also responded to Watts' cell but did not secure or provide emergency medical aid or transport for emergency medical care.

The complaint alleges that at 10:10 p.m., Watts had another seizure at which time, all the Nurse and Officer defendants were present.  No medical care was rendered other than to check Watts' vitals.  Ten minutes later, at 10:20 p.m., Watts had another seizure with all of the Nurse and Officer defendants present.  No medical care was rendered.  Soon after this seizure, Watts fell asleep.

At 10:50 p.m., Watts woke up to use the toilet.  Officers Coffelt and Clark tried to assist him, but Watts urinated and defecated on himself, the toilet, the bed, and the Officers.  No medical care was rendered, other than to check Watts' vitals.  At 11:15 p.m., Watts had another seizure with all of the Nurse and Officer defendants present.  No medical care was rendered, other than to check Watts' vitals.  Finally, at 11:34 p.m., emergency medical services were summoned.

The complaint alleges that rather than attempting to secure emergency medical services, the Nurse and Officer defendants' efforts were focused on discharging Watts from the jail.  The complaint also alleges that the Nurse and Officer defendants did not attempt to communicate with any hospital medical staff, particularly Mediko, Mediko Correctional Healthcare, Kaveh Ofogh, M.D., Richard J. Murphy M.D., and Varun Choudhary, M.D., to discuss the appropriate response to Watts' seizures and alcohol withdrawal.

Watts was transported to Winchester Medical Center in Frederick County, Virginia, and arrived there at approximately 12:09 a.m. on May 6, 2011.  At 12:12 a.m., Watts had another seizure of limited duration and failed to respond to verbal or physical stimuli.  Eventually, Watts experienced pulseless electrical activity ("PEA") and coded.  The complaint alleges that the PEA was caused by severe metabolic acidosis caused by the multiple, untreated seizures Watts had experienced at the jail.  Due to the PEA, Watts suffered from hypoxic encephalopathy, the deprivation of oxygen in the brain.  At the time of the arrest, Watts was fully independent, able to manage his affairs, and able to care for himself in all respects.  Now, Watts is completely dependent upon others for all his activities of daily living, and is unable to eat, stand, walk, or go to the bathroom himself.  The complaint alleges that Watts will require 24-hour care for the rest of his life.

Suzanne Boren filed this complaint as Conservator and Guardian of Watts' estate on February 15, 2013.  Count I alleges Negligence, Gross Negligence, and Willful and Wanton Negligence on the part of NRJA, NRADC, Superintendent Conover, and the Officer defendants. Count II alleges Negligence, Gross Negligence, and Willful and Wanton Negligence against NRJA, NRADC, and the Nurse defendants.  Count III alleges Denial, Delay and Withholding Medical Care in violation of the United States Constitution on the part of the Officer and Nurse defendants.  Finally, Count IV alleges Denial, Delay and Withholding Medical Care in violation of the Virginia Constitution on the part of all defendants.

Defendants filed motions to dismiss, and the court heard oral argument on May 16, 2013. After considering the arguments of counsel and the relevant case law, the court concludes that the motions to dismiss should be granted in part and denied in part as follows: Superintendent Conover shall be dismissed from Count I of the complaint; Count IV shall be dismissed in its entirety; and punitive damages, as related to Count I and II, are stricken to the extent that they exceed the statutory cap of $350,000.00.

## II.     Standard on Motion to Dismiss

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  To survive a Rule 12(b)(6) motion, the claimant's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the pleading must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  While the court must accept the claimant's factual allegations as true, this tenet is "inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The

4

complaint must contain sufficient facts from which the court, calling upon "its judicial

experience and common sense," can conclude that the pleader has "shown" that he is entitled to

relief.  Id. at 679; Fed. R. Civ. P. 8(a).

### III.    Counts I and II: Negligence, Gross Negligence, Willful and Wanton Negligence

In Count I of the complaint, Boren alleges that the Officer defendants operated the jail in

a negligent manner by, among other things, failing to administer proper care of Watts during his

period of incarceration.  Additionally, Boren alleges that these defendants' actions amount to

gross negligence and willful and wanton negligence.  Compl. at ¶ 62-69.  Boren alleges that

under the doctrine of respondeat superior the NRJA and Superintendent Conover are liable for

the Officer defendants' actions.  Compl. at ¶ 60.

In Count II of the complaint, Boren alleges that the Nurse defendants failed to render

nursing services within an acceptable standard of medical care within the medical community.

Additionally, Boren alleges that these defendants' actions amount to gross negligence and willful

and wanton negligence.  Compl. at ¶ 70-77.  Boren alleges that the NRJA is liable for the actions

of the Nurse defendants under the doctrine of respondeat superior.  Compl. at ¶ 60.

In response, all defendants argue that the NRJA is entitled to sovereign immunity for

claims alleged against the NRJA, itself, and its employees arising out of acts or omissions

involved in the operation of the jail and the provision of medical care to detainees.  Additionally,

defendants argue that Boren has failed to state a claim for gross negligence and willful and

wanton negligence.

### A.  Sovereign Immunity

The NRJA argues that it enjoys state sovereign immunity because it is an instrumentality

of the Commonwealth, performing an essential governmental function.  At oral argument, the

NRJA further expounded on this argument, contending that the state sovereign immunity calculus involves a fact-intensive inquiry into whether the entity falls on the "sovereign immunity spectrum" between a state agency and a municipal corporation.  Thus, according to the NRJA, the fact that it squarely occupies a status between that of a state agency and a municipal corporation, and indeed, possesses more "state-like" characteristics, "weighs in favor of finding sovereign immunity, not against it." [2]  (Dkt. No. 35, p. 3.)

An entity may be entitled to sovereign immunity if it is an arm or agency of the state or if it is a municipal corporation or should be treated as such.[3]  Virginia Elec. & Power Co. v. Hampton Redevelopment & Hous. Auth., 217 Va. 30, 225 S.E.2d 364 (1976) ("VEPCO"). Based on these facts, the court finds that the NRJA is not entitled to sovereign immunity, because it is neither an arm nor agency of the state and has not demonstrated that it should be treated like a municipal corporation.[4]

First, it is clear that the NRJA is not an arm or agency of the state.  In VEPCO, the Virginia Supreme Court held that a municipal housing authority was not an arm or agency of the state because it does not come into existence by state initiative, but rather requires "local activation."  217 Va. at 33, 225 S.E.2d at 367.  Similarly, the NRJA requires local activation for its creation.  Indeed,  Virginia Code § 53.1-95.2, the NRJA's enabling statute, states that "[t]he

---

[2] The NRJA provided no case law in support of this formulation of the state sovereign immunity calculus, except to cite three state court cases devoid of any opinion or reasoning.  The court is unconvinced of this argument, noting that the Virginia Supreme Court has not adopted such an analysis.

[3] Under Virginia law, if the entity is an arm or agency of the state, then it is entitled to the Commonwealth's broad immunity from tort liability.  If, however, the entity establishes that it should be treated like a municipal corporation, the entity is immune only from liability arising from its performance of governmental, as opposed to proprietary, functions.  See Heckenlaible v. Virginia Reg'l Peninsula Jail Auth., 4:06CV25, 2006 WL 3196750, at *3 (E.D. Va. Nov. 1, 2006) (citing VEPCO, 217 Va. at 33, 225 S.E.3d at 367).

[4] At oral argument, the NRJA conceded that it was not an arm or agency of the state, and, due to its "state-like" characteristics, it was not a municipal corporation.

governing bodies of two or more counties, cities, or towns or a combination thereof may by concurrent ordinances or resolutions or by agreement, create a jail authority."

Second, the NRJA should not be treated as a municipal corporation. In so holding, the court is persuaded by the reasoning of the Eastern District of Virginia in Heckenlaible v. Virginia Regional Peninsula Jail Authority, 4:06CV25, 2006 WL 3196750 (E.D. Va. Nov. 1, 2006). In Heckenlaible, the court, relying on the Virginia Supreme Court in VEPCO, held that the Virginia Peninsula Regional Jail Authority was not entitled to sovereign immunity because it was neither an arm or agency of the state nor a municipal corporation. Id. at *1. There, the court noted that two basic factors must be considered in determining whether a particular entity occupies the status of a municipal corporation: first, what attributes of municipality the entity possesses; and, second, in light of this initial consideration, the particular purpose for determining whether a municipal corporation is present. Id. at *3-4.

In determining the first factor, the Heckenlaible court noted that the following six attributes are "essential to viability as a municipal corporation:"

(1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;

(2) Creation to serve a public purpose;

(2) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenues, personal and real property;

(4) Possession of the power of eminent domain;

(5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state;

(6) Management of the corporation vested in a board of directors or a commission.

Id. (quoting <u>City of Richmond v. Richmond Metro. Auth.</u>, 210 Va. 645, 646, 172 S.E.2d 831, 832 (1970)).  The <u>Heckenlaible</u> court found that an agency could not be treated as a municipal corporation if it did not possess all six of these essential attributes of a municipal corporation. <u>Id.</u> at *4 (citing <u>Hauth v. Southeastern Tidewater Opportunity Project, Inc.</u>, 420 F. Supp. 171 (E.D. Va. 1976)).[5]  As for the second factor, the <u>Heckenlaible</u> court noted  "[g]enerally, 'if the pivotal point under consideration involves a matter of procedure, there is more likelihood that a particular entity will be declared a municipal corporation; but if a point of substantive law is involved, it is less likely that the entity will be declared a municipal corporation.'"  <u>Heckenlaible</u>, 2006 WL 3196750, at *3 (quoting <u>VEPCO</u>, 217 Va. at 33, 225 S.E.3d at 367).

The NRJA concedes that it does not meet all six essential attributes laid out in <u>Richmond Metro Authority</u>, because it is an instrumentality, "more akin to arms or agencies of the state than political subdivisions."  (Dkt. No. 35, p. 3.)  While the NRJA serves a public purpose, has a common seal, can sue and be sued, can enter into contracts, may borrow money and issue tax exempt bonds, and has corporate management vested in a corporate board, it is not a political subdivision and lacks the power of eminent domain.  <u>See</u> Va. Code § 53.1-95.7.  Because it does not meet the first factor as set for in <u>Heckenlaible</u>, the court concludes that the NRJA cannot be treated a municipal corporation, and sovereign immunity does not bar the state law claims set out in Count I and II of the complaint.

---

[5] In <u>Hauth v. Southeastern Tidewater Opportunity Project, Inc.</u>, 420 F. Supp. 171, 172-73 (E.D. Va. 1976), the Eastern District of Virginia held that sovereign immunity did not shield a community action agency, which was formed by various cities and counties of Virginia, from an action in negligence.  In so holding, the <u>Hauth</u> court concluded that the agency could not be treated as a municipal corporation because it did not possess all six of the essential attributes of a municipal corporation, namely the agency was not a political subdivision, lacked the power of eminent domain, and could not borrow money by issuing tax exempt bonds.  <u>Id.</u> at 174.

### B.  Gross Negligence and Willful and Wanton Negligence

Gross negligence is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another.  Ferguson v. Ferguson, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971).  "It is a heedless and palpable violation of legal duty respecting the rights of others."  Town of Big Stone Gap v. Johnson, 184 Va. 375, 378, 35 S.E.2d 71, 73 (1945).  Gross negligence amounts to the absence of slight diligence, or the want of even scant care.  Id.

Willful and wanton negligence is acting consciously in disregard of another person's rights or acting with reckless indifference "to [the] consequences with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another."  Woods v. Mendez, 265 Va. 68, 76-77, 574 S.E.2d 263, 268 (2003).  "Willful or wanton negligence involves a greater degree of negligence than gross negligence," in that an essential ingredient of the act or omission in willful or wanton negligence is an actual or constructive consciousness of the danger involved.  Boward v. Leftwich, 197 Va. 227, 231, 89 S.E.2d 32, 35 (1955).

"The difference between ordinary negligence and gross negligence is one of degree; however, the difference between any form of negligence and causes of action for willful and wanton conduct. . . is a matter of kind."  Green v. Ingram, 269 Va. 281, 292, 608 S.E.2d 917, 923 (2005).  Indeed, "'[a]n actor guilty of willful and wanton conduct intends his act, but not the resulting harm'. . . . Ill will is not a necessary element of willful and wanton negligence."  Id. (quoting Infant C. v. Boy Scouts of America, Inc., 239 Va. 572, 582, 391 S.E.2d 322, 327 (1990)).

i.   The Officer and Nurse Defendants

The Nurse and Officer defendants argue that they were not grossly negligent or willfully and wantonly negligent as they provided "some degree" of care to Watts.  Specifically, they argue that they responded to Watts' holding cell, asked him if he was alright, checked his vitals, and assisted him with using the toilet.  (Dkt. No. 6, 11, 19.)  The court finds that the complaint adequately alleges that the Nurse and Officer defendants were both grossly negligent and willfully and wantonly negligent.  The complaint alleges that Watts arrived at the 1:15 p.m. with an alcohol level of 0.19.  More than six hours later, Watts was administered another breathalyzer test and registered a 0.10.  Despite these high alcohol levels, Watts was placed in a holding cell with no additional supervision.  Nearly two hours later, defendant Officer Clark, while conducting a routine security check, noticed that Watts had a blood pattern on his mouth, possibly caused by seizures.  Over the course of the approximately two hours, Watts would have an additional four seizures.  During this time, the Officer and Nurse defendants did not summon emergency medical aid; rather, as the complaint alleges, they were "focused on discharging Watts from NRADC and arranging transportation for Watts to his mother's home."  Compl. at ¶ 36.  The complaint alleges that the only "health care services" rendered by these defendants "consisted of observing Watts and perhaps taking his vitals."  Compl. at ¶ 38.  Furthermore, Boren alleges that no doctors were called in response to Watts' condition, one that caused him to lose consciousness multiple times and lose control of his bodily functions.  Based on these facts, the court finds that Boren has adequately plead both gross negligence and willful and wanton conduct, and the court will deny the Officer and Nurse defendants' motions to dismiss on this basis.

ii.  The NRJA

In the complaint, Boren alleges that the NRJA is liable under the theory of respondeat superior for gross negligence and willful and wanton negligence.  Under Virginia law, a plaintiff claiming that an employer is liable under the doctrine of respondeat superior must allege that the tortious conduct occurred while the employee was performing his employer's business and acting within the scope of the employee's employment.  See Butler v. Southern States Coop. Inc., 270 Va. 459, 465, 620 S.E.2d 768, 773 (2005).  At the pleading stage, the plaintiff's burden of production on the "issue of whether an employee acted within the scope of the employment when the act which caused the injury was committed . . . is met by establishing the employer-employee relationship at the time."  Majorana v. Crown Cent. Petroleum Corp., 260 Va. 521, 527, 539 S.E.2d 426, 429 (2000); see Gina Chin & Assocs. v. First Union Bank, 260 Va. 533, 543, 537 S.E.2d 573, 578 (2000) (noting the test for scope of employment is whether the service by which the tortious act was done was within the ordinary course of business).  In Majorana, the court noted that the plaintiff had presented evidence that the employee assaulted a customer at the employer's normal place of business, while performing the normal business of the employer. Marjorana 260 Va. at 527, 539 S.E.2d at 429.  Once an employment relationship is established, a rebuttable presumption of liability arises.  Id. at 526, 539 S.E.2d at 429; see, e.g., Heckenlaible v. Virginia Reg'l Peninsula Jail Auth., 4:06CV25, 2006 WL 2252026, at *3 (E.D. Va. Aug. 3, 2006).

Boren has alleged that the Officer and Nurse defendants were employed by the NRJA, that they were performing their duties as correctional officers guarding inmates, and that the alleged failure to provide medical attention occurred in the course of performing those duties. Thus, the complaint establishes a plausible claim that the NRJA is liable under the doctrine of

11

respondeat superior for the claims stated in Count I and II of the Complaint, and the NRJA's motion to dismiss is denied on this basis.

### iii.  Superintendent Conover

Boren asserts that Superintendent Conover is liable under the doctrine of respondeat superior for the Officer defendants' conduct alleged in Count I of the complaint.  "Public officers are generally not vicariously liable for the actions of a subordinate unless the public officer appointed that subordinate."  Rasi v. Dep't of Corr., 7:08CV00203, 2009 WL 102530, at *10 (W.D. Va. Jan. 14, 2009) (citing First Virginia Bank-Colonial v. Baker, 225 Va. 72, 80 n.4, 301 S.E.2d 8, 13 n.4 (1983)).  Virginia Code § 53.1-95.7(3) vests in the NRJA the power "[t]o appoint, select, and employ officers, agents, and employees, including a superintendent of the regional correctional facility and necessary jail officers and employees therefor, . . . and to fix their respective compensations[.]"  Because respondeat superior in Virginia imposes liability on an employer and Virginia Code § 53.1-95.7(3) clearly establishes that the NRJA was the Officer defendants' employer, Superintendent Conover is not liable under respondeat superior.

At oral argument, Boren also argued that a supervisory liability claim against Superintendent Conover is based on his affirmative, non-delegable duty to ensure the care of detainees pursuant to Virginia Code § 53.1-95.8 and § 15.2-1609.  Boren argues that under this duty, Superintendent Conover may be held liable for the acts or omissions of the Officer defendants.[6]  The court disagrees.  The statutes cited by Boren do not indicate that jail superintendents may be held liable for the actions of their subordinates.  Indeed, the statute reads in relevant part:

> The superintendent appointed by an authority created pursuant to this article to administer its correctional facility shall have and exercise the same control and

---

[6] Boren offers no case law in support of this argument.

authority over the prisoners committed or transferred to such facility as the sheriffs of this Commonwealth have by law over the prisoners committed or transferred to their jails.

During the term of their appointment, the superintendent and jail officers are hereby vested with the powers and authority of a conservator of the peace (i) within the limits of such correctional facility and within one mile thereof; (ii) for the purpose of conveying prisoners to and from such facility; (iii) for the purpose of enforcing the provisions of alternative incarceration and treatment programs pursuant to §§ 53.1-129, 53.1-131, and 53.1-131.2; (iv) for the purpose of providing security and supervision of prisoners taken to a medical, dental, or psychiatric facility; and (v) for the purpose of providing a security escort and supervision of prisoners transported to a funeral or graveside service.

Va. Code § 53.1-95.8.  This section incorporates by reference Sections 53.1-116 et seq. and 15.2-1609 of the Virginia Code, which set out the powers and duties of sheriffs.  None of these sections permits a jail superintendent or a sheriff to be held vicariously liable for the actions or omissions of the officers he oversees.[7]  In the absence of a clear mandate from the Virginia legislature, this court will not deviate from the traditional employer-employee requirement of respondeat superior so as to impose supervisory liability upon regional jail superintendents under this doctrine.[8]  Thus, Superintendent Conover's motion to dismiss is granted in part, and he shall be dismissed from Count I.

## IV.    Count III:  Section 1983

Count III alleges that the Officer and Nurse defendants were deliberately indifferent to Watts' serious medical need, particularly alcohol withdrawal, in violation of 42 U.S.C. § 1983.

---

[7] At common law, sheriffs are liable for the actions of their deputies.  Moore's Adm'r v. Dawney, 13 Va. (3 Hen. & M.) 127, 1808 WL 620, at *5 (1808) ("The law looks upon the Sheriff and his officers as one person . . . if they transgress, he is answerable to the party injured by such transgression . . . ."  (emphasis original)).  However, no Virginia case has extended this common law rule to regional jail superintendents in the two centuries since Moore was decided.

[8] The complaint does not allege that these duties make Superintendent Conover independently liable.  Notably, Superintendent Conover is not named in the Section 1983 count of this complaint.  See Jones v. Lopez, 262 F. Supp. 2d 701, 708 (W.D. Tex. 2001) (holding that supervisory liability under § 1983 based on a state statute is only actionable when the statute specifically rendered a jail superintendent responsible for all actions of his deputies).

In their motions to dismiss, these defendants claim that the complaint fails to state a claim upon which relief can be granted, and they are entitled to qualified immunity on these facts.

To state a cause of action under § 1983, a plaintiff must allege that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

### A.  Sufficiency of the Complaint

Medical treatment claims under § 1983 fall within the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  As Watts was a pretrial detainee, the denial of medical care is properly found under the Due Process Clause of the Fourteenth Amendment.  Martin v. Gentile. 849 F.2d 863, 870 (4th Cir. 1988).  "Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment."  Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001).  Thus, in order to state a claim under the Fourteenth Amendment for insufficient medical assistance, the court should apply the deliberate indifference standard set forth in Estelle v. Gamble, 429 U.S. 97, 104 (1976).  Id.; see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998).  To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must allege facts sufficient to demonstrate that jail officials were deliberately indifferent to a serious medical need.  Estelle, 429 U.S. 97, 104 (1976).

"Deliberate indifference requires a showing that the defendants . . . actually knew of and ignored a detainee's serious need for medical care."  Young, 238 F.3d at 575–76 (citations omitted).  As such, Boren must allege that the defendants' actions were "[s]o grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

"[A] serious . . . medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal citation omitted).  "[T]he need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective."  Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).  Indeed, a medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. Sosebee v. Murphy, 797 F.2d 179, 181-83 (4th Cir. 1986).

"[M]ere delay or interference can be sufficient to constitute a violation of the Eighth Amendment."  Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009).  Where the plaintiff alleges an unconstitutional delay of medical care, the delay must result in "substantial harm," see Shabazz v. Prison Health Serv., Inc., 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. Feb. 9, 2012) (citing Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)), which "may be satisfied by lifelong handicap, permanent loss, or considerable pain."  Id. (quoting Garrett v. Stratman, 254 F.3d 946, 950 (10th Cir. 2001)) (internal citations and punctuation omitted).

   i.   Nurses

Boren claims that the Nurse defendants were deliberately indifferent to Watts' serious medical needs, namely alcohol withdrawal.  In their motions to dismiss, the Nurse defendants argue that the complaint fails to allege that they knew that Watts was experiencing alcohol withdrawal symptoms, thereby establishing no more than medical malpractice.

The complaint adequately alleges that Watts' alcohol withdrawal was a serious medical need, the Nurse defendants were actually aware of that need, and that they acted in an inadequate manner to mitigate the risk of the harm arising from the seizures.  Watts lost consciousness many times over the course of two hours and was unable to control his bodily functions.  The Nurse defendants witnessed Watts' three seizures, and failed to provide any adequate medical assistance to suppress them.  Instead of seeking emergency medical attention, the Nurse defendants were focused on discharging Watts and arranging transportation for him to his mother's home.  Indeed, the complaint alleges that the delayed response caused Watts to experience PEA due to the severe metabolic acidosis built-up from the multiple, untreated seizures, resulting in hypoxic encephalopathy.  Compl. at ¶ 51.  Boren alleges that the Nurse defendants' delay in treatment has rendered Watts permanently disabled and dependant on others for his daily living needs.

The Nurse defendants claim that they did not delay treatment and provided "some care" because, during the nearly two hour period of Watts' seizures, they routinely took his vitals and monitored his condition.  A claim for deliberate indifference does not require plaintiff to allege "that he was literally ignored."  Badu v. Broadwell, 5:11-CT-3192-F, 2013 WL 286262, at *5 (E.D.N.C. Jan. 24, 2013) (citing Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010)).  A medical professional's decision to employ "the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment."  Berry, 604 F.3d at 441 (quoting Estelle, 429 U.S. at 106); see also Brown v. Lamanna, 304 F. App'x 206, 208 (4th Cir. 2008) ("'dogged[ ] persist[ence] in a course of treatment known to be ineffective' can violate the Eighth Amendment" (citing Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005))).  The complaint alleges that the only "care" that the

Nurse defendants administered was to check Watts' vitals, and such care was unsuccessful as Watts' alcohol withdrawal and seizures continued for approximately two hours.

Thus, at this state of the litigation, taking the facts alleged in the complaint in light most favorable to Boren, the court cannot conclude that Boren has failed to state a claim against the Nurse defendants, as the complaint adequately alleges both a serious medical condition and a failure to provide adequate and effective treatment for that condition without undue delay.  Thus, the Nurse defendants' motions to dismiss are denied in this regard.

### ii.    The Officer Defendants

The Officer defendants argue that the complaint fails to allege that they knew Watts was dependent on alcohol and, thus, they did not recognize that Watts required medical attention. While prison personnel may rely on the opinion of the medical staff as to the proper course of treatment, non-medical prison employees can be found to have acted with deliberate indifference if such official was personally involved with a medical treatment, deliberately interfered with prison medical personnel's treatment, or tacitly authorized or was indifferent to the prison medical personnel's misconduct.  Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990).

The complaint alleges that from 10:10 p.m. until 11:34 p.m., the Officer defendants witnessed Watts lose consciousness at least three times, lose control over his bodily functions, and urinate and defecate on both Officers Coffelt and Clark.  The court finds that based on these facts alleged in the complaint, the Officer defendants were aware of Watts' serious medical need and did not contact emergency medical aid until 11:34 p.m.  During these seizure episodes, the complaint alleges that the Officer defendants attempted to secure transportation to his mother's home, rather than to a hospital.  Thus, taking the allegations in the complaint as true, the court finds that Boren has sufficiently stated claims of deliberate indifference to Watts' serious

medical need against the Officer defendants, and the motions to dismiss, in this regard, are denied.

### B.  Qualified Immunity

The Nurse and Officer defendants also contend that they are entitled to qualified immunity from the allegations in the complaint.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant asserts the affirmative defense of qualified immunity, the court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right[,]" and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. at 232 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  In its discretion, the court may address either prong first based upon the "circumstances in the particular case at hand."  Id. at 236.  As regards the first factor, the court finds that Boren has adequately pled a violation of his constitutional right, as the complaint alleges both a serious medical condition and a refusal to provide adequate and effective treatment for that condition without undue delay.

As regards the second factor, "the lodestar for whether a right was clearly established is whether the law gave the officials fair warning that their conduct was unconstitutional."  Iko, 535 F.3d at 238.  Indeed, the court must inquire into "whether it would have been apparent to a reasonable officer in the respective defendants' positions that his actions violated the [right]."  Altman v. City of High Point, 330 F.3d 194, 200 (4th Cir. 2003).  At the motion to dismiss stage, the court must determine whether the facts as alleged in the complaint establish that the Officer

and Nurse defendants' actions themselves are objectively legally reasonable.  Harlow, 457 U.S.

at 819.  As noted above, the Nurse and Officer defendants observed Watts' four seizures and the

loss of control of his bodily functions.  Instead of securing medical transport to a hospital, they

focused their efforts on discharging him.  The court finds that the facts alleged in the complaint

give rise to a plausible claim that the Nurse and Officer defendants' actions were not objectively

legally reasonable.[9]  Thus, the court will deny the Nurse and Officer defendants' motions to

dismiss on qualified immunity grounds.  If need be, the court will entertain a motion for

summary judgment, raising the defense on a more fully developed record.

## V.      Count IV: Virginia Constitutional Claims

Count IV of the complaint alleges violations of Virginia Constitution Article I, Section 11

for the denial, delay and withholding of medical care.  The Virginia Supreme Court has made

clear that the provisions of the Virginia Constitution do not provide a basis for a private cause of

action unless they are self-executing.  See Robb v. Shockoe Slip Found., 228 Va. 678, 682, 324

S.E.2d 674, 676 (1985).  Constitutional provisions are self-executing when they expressly so

declare.  Id. (citing Va. Const. Art. I, Sec. 8).  Specifically, "[a] constitutional provision may be

said to be self-executing if it supplies a sufficient rule by means of which the right given may be

employed and protected, or the duty imposed may be enforced."  Id.  (internal citations omitted).

---

[9] As the Eastern District of Virginia explained in Fisher v. Neale, 3:10CV486-HEH, 2010 WL 3603495, at *3 (E.D. Va. Sept. 8, 2010):

> A defendant invoking qualified immunity must (1) identify the specific right allegedly violated "at the proper level of particularity," Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007); (2) brief, with full supporting authority, why the right was not so clearly established as to put a reasonable official on notice of any legal obligations; and (3) describe with particularity the factual basis supporting the assertion that a reasonable official in the defendant's situation would have believed his conduct was lawful. See Collinson v. Gott, 895 F.2d 994, 998 (4th Cir. 1990).

The factual record as it pertains to the acts and omissions of the Nurse and Officer defendants are limited to those stated in the complaint, and these defendants have failed to offer any other facts suggesting their actions were objectively legally reasonable.

Indeed, "[e]ven without the benefit of such a declaration, constitutional provisions in bills of rights and those merely declaratory of common law are usually considered self-executing," as are "provisions which specifically prohibit particular conduct."  Id.  However, a constitutional provision is not self-executing if "it merely indicates principles, without laying down rules by means of which those principles may be given the force of law."  Id.  (internal citations omitted).

>Virginia Constitution Article I, Section 11, states:

>>That no person shall be deprived of his life, liberty, or property without due process of law; that the General Assembly shall not pass any law impairing the obligation of contracts; and that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination. . . .

Only the provision regarding the taking of property without just compensation has been deemed self-executing.  Gray v. Rhoads, 55 Va. Cir. 362, 368 (2001), rev'd on other grounds, 268 Va. 81, 597 S.E.2d 93 (2004) (emphasizing that the portion of Article I, Section 11 that pertains to the deprivation of property specifically includes a remedy for takings of property by a governmental entity (just compensation), and reasoning that "[i]f the drafters had intended to provide similar rights and remedies for deprivation of life and liberty, they could have done so by including such language in that provision").  Moreover, Virginia courts have repeatedly rejected the assertion that a private right of action exists under Article I, § 11 for the deprivation of life or liberty.  Botkin v. Fisher, CIV. A. 5:08CV00058, 2009 WL 790144, at *6 (W.D. Va. Mar. 25, 2009) (collecting cases).  Thus, the court concludes that no private right of action for money damages exists based on the due process clause contained in Virginia Constitution Article I, Section 11, and defendants' motions to dismiss shall be granted in this regard.

## VI.  **Punitive Damages**

Defendants argue that damages should be capped at the statutory maximum of

$350,000.00 pursuant to Virginia Code § 8.01-38.1.[10]  While the court finds that the complaint

alleges sufficient facts in support of the punitive damage claim, the $3,000,000.00 demand of

punitive damages exceeds the statutory cap imposed by Virginia law.  Thus, the court believes it

appropriate to strike damages to the $350,000.00 maximum as to the state law claims.  Fed. R.

Civ. P. 12(f);  see, e.g., Worley v. KIA Motors Am., Inc., 1:01CV00102, 2001 WL 1517158

(W.D. Va. Nov. 28, 2001).

## VII.  **Conclusion**

Thus, the court holds that the defendants' motions to dismiss are granted in part and

denied in part.  Superintendent Conover shall be dismissed from Count I of the complaint, and

Count IV is dismissed in its entirety.  Any claim for punitive damages in excess of $350,000.00

as to the state law claims stated in Count I and II is stricken.  An appropriate Order shall be

entered this day.

The Clerk shall send a copy of this Memorandum Opinion to all counsel of record.

Entered:  September 30, 2013

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

---

[10] The court must apply the statutory cap in this federal case.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78–79 (1938).

21